UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BEVERLY DILLON, et al.,

    Plaintiffs,

v.                                         CASE NO: 8:98-cv-2237-T-23TGW

AXXSYS INTERNATIONAL, INC.,
et al.,

    Defendants.
_____/

## **ORDER**

Pursuant to Rule 50(b), Federal Rules of Civil Procedure, Deborah Austin ("Austin") renews her motion for judgment as a matter of law on the plaintiff's second claim. The second claim alleges that Austin "personally participated or aided in making the sale" of unregistered securities within the meaning of Section 517.211(2), Florida Statutes, part of the Florida Securities and Investor Protection Act ("FSIPA"), Section 517.07, et. seq., Florida Statutes.[1]

Austin moved unsuccessfully for judgment as a matter of law at the completion of the evidence, arguing that the plaintiffs failed to offer sufficient evidence to support submission to the jury of Austin's alleged liability under Section 517.211(2). The jury returned a verdict against Austin. Austin renews her motion for judgment as a matter of law, arguing that "the plaintiffs have failed to offer sufficient evidence or testimony to support a jury verdict in the plaintiffs' favor on the elements of their claim of violation of [FSIPA] § 517.07 against Austin."

---

[1] Austin moves for judgment as a matter of law also on claim four, which seeks judgment under the Florida Uniform Fraudulent Transfer Act, Section 726.105, Florida Statutes. The motion is **DENIED**.

In deciding a Rule 50(b) motion the court must determine "whether reasonable jurors could have concluded as this jury did based on the presented evidence." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1237 (11th Cir. 2001) (citing Quick v. People's Bank, 993 F.2d 793, 797 (11th Cir. 1993)).  The court should grant the motion "if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." Davis, 245 F.3d at 1237 (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)).  Alternatively, the motion should be denied "if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions." Davis, 245 F.3d at 1237.

## BACKGROUND

Austin, vice-president and resident agent for the corporation; Adam M. Reiser ("Reiser"), Austin's spouse and president of the corporation; and Dominick F. Maggio ("Maggio") formed AXXSYS International, Inc. ("AXXSYS" f/k/a Internet Access Company Inc., and Boca.Net).  AXXSYS planned to acquire local and regional internet service providers ("ISP"s) and to facilitate corporate growth with improved management, marketing, and technology.  Reiser and Maggio issued to the plaintiffs unregistered common shares of AXXSYS.

The plaintiffs allege that Austin "personally participated or aided in making the sale" of unregistered securities subject to Section 517.211(2), Florida Statutes, which states:

> Each person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally

>    participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security.

Challenged by Austin's Rule 50(b) motion to identify evidence in the record to support the jury's verdict on the claim that Austin "personally participated or aided in making the sale," the plaintiffs rely primarily on Austin's attendance at a dinner meeting among Austin, Reiser, Maggio, and Richard Wiles ("Wiles"), a salesman employed by AXXSYS (but not a representative of the plaintiffs).  The plaintiffs rely further on Austin's periodic appearance in the corporate office and her sometimes involvement in general corporate business.

      First, with respect to the dinner meeting, Wiles provided testimony about Austin's role that evening.  Wiles' testimony on the subject is sparse but typical of the intermittent references in the record to this dinner meeting:

>    Q:     Approximately when did you meet her?
>
>    A:     June 1997.
>
>    Q:     And how was it that you came to meet her?
>
>    A:     Well, first just in the office, I think, maybe, when we were initially went (sic).  And then one of the meetings afterwards we went out to dinner at a Chinese or Japanese restaurant; I don't remember which.
>
>    Q:     And what--this--one of those meetings down there, what was the subject of these meetings down there?
>
>    A:     Well, when--really didn't say much, other than meet her in the office. And then when we went to dinner, it was--we didn't really know each other, so we basically just kind of talked about the business idea, what a great opportunity it was for everybody.

> Q: Try--I'm trying--I want to try to fix this in point of time. Let me just try. Was this before or after the investment by the plaintiffs in this case, this meeting you are talking about--
>
> A: It would have been before.
>
> Q: Okay. So it was--
>
> A: It was early summer, early/mid summer, I would say, June or July.
>
> Q: And did Ms. Austin, or did she not, participate in the discussions about the business?
>
> A: She did in just little additions, that she pretty much was on board with the whole idea and all--was very favorable, everything that was said about the whole plan to move forward.

(Doc. 349 at 52-53) (With respect to Austin, this testimony is without evidentiary value and, in fact, is virtually meaningless, comprising mere conclusions ["on board," "favorable," "great opportunity"] but excluding any fact of probative value [for example, any direct statements from Austin].) The plaintiffs maintain that because Wiles was responsible for soliciting investors in behalf of AXXSYS, Austin's presence at a dinner with Wiles (even though the plaintiffs were absent and no one sold a security to anyone during dinner), at which dinner the diners discussed the corporate "business plan" to some undetailed extent, constitutes "an essential link in the chain of inducing Plaintiffs to purchase." The plaintiffs contend that Austin, in concert with Reiser, undertook to "convince [Wiles]," who in turn convinced the plaintiffs, to buy shares in AXXSYS.

Secondly and finally, the plaintiffs contend:

> Austin's registration of Boca.Net to do business in Florida along with her efforts in the financial and business matters of Boca.Net were essential links in the chain of activity that led to Boca.Net's appearance of profitability which Plaintiffs testified they relied on in deciding to invest.

- 4 -

Again, Wiles provides testimony that typifies the evidence pertinent to Austin's role in the daily affairs of AXXSYS's business:

> Q:   Now--and you were actually employed and physically going to the business as an employee for approximately how long?
>
> A:   It wasn't very long. I--I didn't actually go down until a couple weeks, maybe even a month, after Maggio had actually moved in--moved there. So I--I don't think I was there for more than four to six weeks at the most.
>
> Q:   During that time, what did you observe Deborah Austin's role to be in connection with Axxsys?
>
> A:   She--she would be in and out a lot. When I say "a lot," I would see her, you know, maybe once a day or twice a day sometimes. Mostly seemed to be discussing things with her--her mother.
>
> Q:   Who was her mother?
>
> A:   It was Beatricia Austin.
>
> Q:   And what was her mother's position?
>
> A:   I looked at her as the office manager. She had already been doing all of the books prior to us forming this company. And she just stayed there and continued on.
>
> Q:   Okay. Please proceed.
>
> A:   They seemed to visit a lot, would be looking at papers--I don't know what they were. But maybe she was helping her out or vice versa; I don't know. But she seemed to have an interest in whatever was going on in the office.

(Doc. 349 at 53-54) The record includes several references to Austin's subscription to the incorporation papers, the occasional use of her credit card for AXXSYS's business, her attendance periodically at the corporate offices, and the presence in Austin's home

- 5 -

of certain of AXXSYS's business records (and, of course, the presence in Austin's home of her husband, the president of AXXSYS).

## ANALYSIS

An officer of a corporation incurs joint and several liability to an investor for the sale of an unregistered security only if the officer "personally participate[s] or aid[s] in" the sale of an unregistered security.  Fla. Stat. § 517.211(2).  Nichols v. Yandre, 9 So.2d 157, 160 (Fla. 1942), Florida's controlling authority on the subject, states that the requirement that a defendant "personally participate or aid in making the sale" necessarily "implies some activity in inducing the purchaser to invest."  See also Ruden v. Medalie, 294 So.2d 403, 406 (Fla. 3d DCA 1974); Baraban v. Manatee Nat'l. Bank of Bradenton, 212 So.2d 341 (Fla. 2d DCA 1968); Sorenson v. Elrod, 286 F.2d 72 (5th Cir. 1960).  In other words, the officer must actively and directly, rather than passively, derivatively, or by attribution or imputation, influence or induce the investor to buy.  Nichols, 9 So.2d 57 at 160.  For example, Binder v. Gordian Sec., Inc., 742 F. Supp. 663, 669 (N.D. Ga. 1990), displays divergent results under, on the one hand, the Georgia Securities Act, which subjects to liability a "controlling person," and on the other hand, the FSIPA:

> In Count IV of their Complaint, plaintiffs allege that all defendants, including Thompson, violated Fla.Stat. § 517.301(1)(a), known generally as Florida's "Little 10b-5."  See Research & Development Industries, Inc. v. Merril Lynch, Pierce, Fenner & Smith, Inc., No. 82-539, slip op. at 3 (M.D. Fla. Aug. 28, 1985) (unpublished).  The Florida Securities and Investors Protection Act, however, does not provide for secondary, "controlling person" liability.  It imposes liability only on "[a]ny person purchasing or selling a security in violation of § 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or

> purchase." Fla.Stat. § 517.211(2).  Thus, in order to be liable under Fla.Stat. 517.301(1)(a), a director or officer must personally engage in some act or acts that induce a purchaser to invest.  Ruden v. Medalie, 294 So.2d 403, 406 (Fla.Dist.Ct.App. 3 1974) (construing identical language of predecessor to Fla.Stat. § 517.211(2)).  Because there is no evidence that Thompson personally induced plaintiffs to invest in Mineral Investors, the court GRANTS his summary judgment motion on plaintiffs' Florida law claim.

Similarly, Bailey v. Trenam, Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, 938 F. Supp. 825 (M.D. Fla. 1996), rejects an attempt to visit liability on a professional employed to facilitate the mechanics of a securities transaction and explains helpfully:

> Defendant must also have "personally participated or aided in making the sale."  F.S.A. § 517.211(1), (2).  This Court addressed this very issue in In re Sahlen & Assoc., Inc. Sec. Litig., 773 F. Supp. 342, 372 (S.D. Fla. 1991) (Hoeveler, D.J.), holding that a "plaintiff may recover under § 517.211 from . . . any officer, director, partner or agent of such a seller who has solicited the sale of the securities on his own behalf or on behalf of the seller."  He "determine[d] that conduct sufficient to constitute solicitation for purposes § 517.211 liability is similar to that deemed sufficient by the Supreme Court in Pinter v. Dahl, [486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)] . . . . "
>
> In Pinter, the Supreme Court reaffirmed the principal that liability as a "seller" under § 12(1) of the Securities Act, 15 U.S.C. § 771(1) is not restricted to those who actually pass title to the securities, but is expansive enough to encompass the entire selling process, including the seller/agent transaction.  486 U.S. at 643, 108 S.Ct. at 2076.  The Court placed limits on this expansiveness by stating that liability only extends to persons who successfully solicit the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.  Id. at 647, 108 S.Ct. at 2078-79.  The Court declined to impose liability merely on the basis of substantial participation in the transaction, fearing that such a basis would extend liability to participants only remotely related to the relevant aspects of the sales transaction . . . .

938 F. Supp. at 828.  The controlling emphasis on "personal participation or aid in making the sale" arises inevitably from the history and content of the statute.

- 7 -

In 1979, Section 9 of Chapter 79-381, <u>Laws of Florida</u>, amended Section 517.211 to codify more explicitly the <u>Nichols</u> interpretation of liability. Section 9 of Chapter 79-381 splits former Section 517.211 into Sections 517.211(1) and (2), the former directed to violations of Section 517.07 and 517.12 and the latter directed to violations of Section 517.301.[2] Before the 1979 amendment, Section 517.211 reached "the person making the sale" and, as well, any director, officer, or the like, who "personally participated or aided in any way making the sale"; the post-1979, statutory descendant, Section 517.211(2), reaches "each person making the sale" but only an officer, director, or the like who "personally participated or aided in making the sale"--but no longer "in any

---

[2] Section 9 of Chapter 79-381 displays vividly the legislative revision of Section 517.211:

517.211  Remedies available in cases of unlawful sale.--

<u>(1)</u>  Every sale made in violation of <u>either s. 517.07 or s. 517.12 may be rescinded</u> <s>any of the provisions of this part shall be voidable</s> at the election of the purchaser<u>,</u><s>;</s> and the person making the sale and every director, officer, <u>partner,</u> or agent of or for the seller, if the director, officer, <u>partner,</u> or agent has personally participated or aided in <s>any way</s> making the sale, shall be jointly and severally liable to the purchaser in an action for <u>rescission (if the purchaser still owns the security) or for damages (if the purchaser has sold the security)</u> <s>the full amount paid by the purchaser together with interest, damages, court costs, and reasonable attorney's fees, including appeals, upon tender of the securities sold or of the contract made.</s> No purchaser otherwise entitled shall have the benefit of this <u>subsection</u> <s>section</s> who has refused or failed, within 30 days <s>from the date of the sale</s>, to accept an offer <u>made</u> in writing by the seller<u>, if the purchaser has not sold the security,</u> to take back the security in question and to refund the full amount paid by the purchaser, <u>or, if the purchaser has sold the securities, to pay the purchaser an amount equal to the difference between the amount paid for the security and the amount received by the purchaser on the sale of the security, together, in either case, with interest on the full amount paid for the security by the purchaser at the legal rate for the period from the date of payment by the purchaser to the date of repayment, less the amount of any income received by the purchase on the security</u> <s>with damages</s>.

<u>(2)  Any person purchasing or selling a security in violation of s. 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, shall be jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission (if the plaintiff still owns the security) or for damages (if the plaintiff has sold the security).</u>

- 8 -

way." At the very least, this 1979 statutory refinement evinces a legislative decision both conforming to Nichols and visiting liability on fewer than all of those who aided the sale "in any way" and fewer than all directors, officers, agents, or the like.

In its current iteration, Section 517.211(2) provides an explicit rule applicable to the claim against Austin.[3] The rule depends on a distinction between a person--whether a corporate stranger or a corporate director, officer, partner, or agent who made or personally participated or aided in the sale--these are liable to rescission and damages under Section 517.211(2)--and a person who neither purchased nor sold a security nor personally participated or aided in the sale or purchase--these avoid rescission or damages under Section 517.211(2). At the very least, the statute provides that a corporate director or officer, who neither sold a security nor personally participated or aided in the sale of a security, answers for neither rescission nor damages, notwithstanding a range of activity both in and in furtherance of other corporate objectives. The statute instructs that effecting or furthering the sale of a security rather than affecting or furthering the other business activities of the seller is the *sine qua non* of exposure to the remedies of Section 517.211(2). Differently stated, in assessing exposure to the remedies of Section 517.211(2), no amount of involvement with the business of the seller will overcome the absence of personal participation or aid in the

---

[3] For the purpose of assessing exposure to the remedies prescribed, Section 517.211(2) divides the world into four groups (not of equal proportion, to say the least): (1) persons who purchased or sold a security in violation of Section 517.301, (2) persons who are a director, officer, partner, or agent of a purchaser or seller and who personally participated or aided in making the sale or purchase, (3) persons who are a director, officer, partner, or agent or a purchaser or seller and who personally neither participated nor aided in making the purchase or sale (Austin resides in this group), and (4) persons who are not a director, officer, partner, or agent of a buyer or seller and who neither purchased nor sold nor personally participated or aided in making the sale or purchase of a security in violation of Section 517.301.

making of the sale.  Section 517.211(2) both visits liability on a complete stranger to the corporation who "makes the sale" and, quite consistently, exonerates even a director or officer if neither personally participating nor aiding in the sale.  In short, the remedies of Section 517.211 depend upon buying and selling a security and not merely running a business, however energetically.

For this reason, the plaintiffs' elaboration of Austin's involvement with the creation and furtherance of the business of AXXSYS is irrelevant to the question whether she is liable under Section 517.211(2) as a person who made the sale or as an officer who participated or aided in the sale (she is neither).  Similarly, the plaintiffs' observations about Austin's candor during her testimony concerning her involvement in the business of the corporation are unavailing, even if accurate.  The fact is that Austin had nothing to do with the sale; the question under Section 517.211(2) ends there.[4]

---

[4] Florida's Blue Sky Law derives from the Uniform Sale of Securities Act promulgated in 1929 by the National Conference of Commissioners on Uniform State Laws and adopted with revisions in Florida in 1931.  Chapter 14899, Laws of Florida (1931).  Although amended frequently, the part of the statute governing the claim against Austin is essentially unchanged (save the elimination of "in any way").  The Uniform Securities Act of 1956, approved by the National Conference of Commissioners on Uniform State Laws on August 25, 1956, includes a provision, broadening the scope of liability and differing markedly from the 1929 version on which Florida's statute is based. The pertinent 1956 provision, Section 410(b) of the Uniform Securities Act of 1956, states:

> Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.  There is contribution as in cases of contract among the several persons so liable.

Uniform Securities Act (1956) § 410(b), 7C U.L.A. 266 (2000).  Florida has never adopted this 1956 statutory scheme of expanded liability (or similar schemes offered in the more recent iterations of the Uniform Securities Act, specifically, Section 605 of the 1985 revision or Section 509 of the 2002 revision).

For legal support, the plaintiffs rely most directly and strongly on Whigham v. Muehl, 500 So.2d 1374 (Fla. 1st DCA 1987), in which the Muehls, in March, 1981, proposed the Whighams' participation in a business venture and received from the Whighams in response an initial check for $10,000.  In July, 1981, "the Muehls wrote to the Whighams" (note that both of the Muehls write, according to the opinion), displaying photographs of the project and naming August 1, 1981, as the "opening date."  "In the same letter, the Muehls expressed their intention to give the Whighams a part of the business, regardless of the debt owed to them, as a way of thanking their best friends." 500 So.2d at 1376.  (Note again that "the Muehls"--not just Mr. Muehl--are credited with the representation.)  In October, 1981, Mr. Muehl again appealed for cash and received $5,000.  In November, 1981, Mr. Muehl received $5,000 more.  "By December 1981 Whigham had provided the Muehls with a total of $25,600 in cash and a $400 radar range."  500 So.2d at 1376.  In June, 1984, Whigham signed an agreement for the October, 1984, purchase of shares in the Muehls' business.  Although unknown to Whigham, who thought the business remained a partnership including the Muehls, a corporation existed after December, 1983.  Nonetheless, throughout the entire transfer of money from the Whighams to the Muehls, the form of business employed by the Muehls was a partnership.  Accordingly, at each moment when funds were procured from the Whighams based on misleading statements or omissions by the Muehls, each Muehl, as a partner of the other Muehl, remained fully liable for the deceptions of the other Muehl.  As partners, each act of one Muehl becomes the act of the other Muehl. As Whigham states:

- 11 -

> By statute, a partner is accountable for representations made by another partner, when those representations are made within the scope of the partnership. By the same token, a partner is charged with knowledge of partnership affairs, except in circumstances where fraud has been committed on the partnership. In addition, the partnership is liable in the event one partner acting within the course of partnership business, receives and misapplies money or property from a person outside the partnership. Furthermore, all partners are jointly and severally liable for conduct chargeable to the partnership. Finally, dissolution of a partnership does not, in and of itself, discharge the existing liability of any partner.

500 So.2d at 1377-78. Accordingly, Whigham holds Mrs. Muehl, an equal partner with Mr. Muehl, fully liable for his misdeeds in conducting the affairs of the partnership.

Again, Whigham explains:

> The record in this case reflects that Mrs. Muehl was not only an equal partner with her husband in the original business venture, but she also had actual knowledge of the funds transmitted by the Whighams which were used in furtherance of the business venture. Mrs. Muehl was active in the conduct of the business, and personally took care of the family and business banking affairs. <u>Pursuant to sections 620.61 and 620.615, the communications and representations made by Mr. Muehl to Whigham over a two to three year period are imputed to Mrs. Muehl</u>. And under the provisions of section 620.735, the partnership was not discharged from its existing liability to Whigham at the time of incorporation, for the partners became the officers, directors, and shareholders in the family-owned corporation.

500 So.2d at 1378 (emphasis added).

The distinctions between Whigham and the instant case are fundamental. First, Mrs. Muehl's liability is weighed with the inclusion of all the imputed acts and omissions of Mr. Muehl during the time of the partnership, which time included both the solicitation of the Whighams, intimate friends of the Muehls', and the transfer of all funds from the Whighams.

Second, the sad history of the Whighams and the Muehls includes much direct, personal contact between Mrs. Muehl and the Whighams (including contact imputed to

- 12 -

her from her husband and partner). For example, <u>Whigham</u> includes this account of immediate and direct involvement by Mrs. Muehl during a time when knowledge of the deceptive affairs of the business were known or attributed to her:

> On June 12, 1984, Whigham signed an agreement for sale of stock. This agreement contemplated the stock transfer would take place in October 1984. Whigham testified that he was led to understand the delay was occasioned by the fact that the business was not yet incorporated. The incorporation had actually been effected in December 1983. Whigham was not apprised of this fact until August 2, 1984, and <u>he did not see a balance sheet until he and his wife asked about it in Mrs. Muehl's presence. At that time, Mrs. Muehl insisted that the Whighams should be shown the records</u>. The balance sheet indicated the total assets of the corporation were $19,000. The listed assets consisted principally of cash and inventory, and the land and buildings were not included as corporate assets.

500 So.2d at 1376 (emphasis added). The details of this odd episode are not revealed but, at least, Mrs. Muehl was involved in a direct discussion with the Whighams about the availability and contents of the pertinent books or records of the business. (Apparently, Mrs. Muehl failed to seize this auspicious opportunity to convey to the Whighams the unwholesome history of the Muehls' doings with the Whighams' money.) Nothing even approaching similar, direct involvement by Austin with the plaintiffs (most pointedly, with respect to any sale) appears in the instant case. The legal consequence of the intimate personal and business insinuation of the Whighams and the Muehls teaches little, if anything, about the instant case, in which the plaintiffs rely principally on the assertion that Austin had dinner with AXXSYS's salesman Wiles, who later would solicit the plaintiffs to invest in AXXSYS.

Third, <u>Whigham</u> utterly fails to mention the single, controlling, and persistent authority announced by the Supreme Court of Florida in <u>Nichols v. Yandre</u>, 9 So.2d 157 (Fla. 1942). Similarly, <u>Whigham</u> fails to evaluate the 1979 amendment to the statute

- 13 -

eliminating the phrase "in any way." In fact, Whigham is predominantly a matter of partnership law and only cumulatively and secondarily (and offhandedly) a matter involving Section 517.211(2). Whatever Whigham says about partnerships or securities or both (and assuming that Whigham, which speaks correctly on partnership law, also speaks correctly on the subject of Section 517.211), Whigham must conform to the requirements of Section 517.211 and Nichols or fall.

## **CONCLUSION**

In sum, the plaintiffs first argue that Austin's presence at the dinner with Wiles creates an "essential link in the sale" and subjects Austin to liability. However, the plaintiffs offer no evidence in the record demonstrating that any action by Austin influenced Wiles's participation in the business endeavor. Further, nothing in the record establishes that this ambiguous dinner was in any respect "essential" to the sale of a security to the plaintiffs or that, even if the dinner was somehow essential (a guess), that any contribution from Austin (none is evidenced) assisted in achieving the sale or enlisting Wiles in the effort (as if that matters). Nothing about this dinner evidences in the slightest that Austin "personally participated or aided in making the sale."

The balance of the plaintiffs' effort focuses on establishing Austin's role as an officer in the corporation. However, the standard of liability is not "personal participation or aid in" the business, but rather "personal participation or aid in making the sale" of an unregistered security.

The record in this case offers no basis to support the jury's verdict on the second claim. Austin did not "personally participate or aid in making the sale" of unregistered

securities. Austin is merely, so to speak, the hand that shook the hand that shook the hand that mattered--not enough under Section 517.211.

Austin's Rule 50(b) motion for judgment as a matter of law (Doc. 342) is **GRANTED** as to the plaintiffs' second claim and **DENIED** as to the plaintiffs' fourth claim. Consequently, the Clerk is directed to enter judgment for the plaintiffs and against Reiser on claim one, fraudulent inducement; claim two, the sale of unregistered securities in violation of Section 517.07 et. seq.; and claim three, misrepresentation in connection with the sale of AXXSYS securities in violation of Section 517.301. Accordingly, the plaintiffs are entitled to **$1,025,316.00** in damages from Reiser on claims one, two, and three. The Clerk is directed to enter judgment for Austin and against the plaintiffs on claim one, claim two, and claim three. The Clerk is directed to enter judgment for the plaintiffs and against both Reiser and Austin on claim four, receipt of fraudulently transferred assets from AXXSYS, in the amount of **$190,000.00**.

ORDERED in Tampa, Florida, on August 16, 2005.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE